## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

HENRIK CHRISTENSEN, individually, and
on behalf of all those similarly situated,

|                                    | |
| --- | --- |
| *Plaintiff,* | |
| vs. | Civil Action No. _____ |
| KRAFT FOODS GROUP, INC. and MODELĒZ GLOBAL LLC, | JURY TRIAL DEMANDED |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff, HENRIK CHRISTENSEN, for his Complaint against Defendants Kraft Foods Group, Inc. ("Kraft") and Mondelēz Global LLC ("Mondelēz") and based upon personal knowledge, information, belief, and investigation of counsel, alleges as follows:

## I.     NATURE OF THE ACTION

1.      This action arises from Defendants' unlawful and intentional manipulation of the prices of cash wheat and wheat futures contracts traded on the Chicago Board of Trade ("CBOT") during the period of at least January 1, 2003 through January 2014 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq. (the "CEA").

2.      From at least January 1, 2003 through January 31, 2014, Defendants, by and through the acts of certain of their officers, agents or employees, engaged in a manipulative and deceptive scheme to manipulate the prices of the Chicago Board of Trade ("CBOT") #2 Chicago Soft Red Winter Wheat futures contract ("CBOT wheat futures contract"), so as to cause artificial prices and artificial price trends in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. ("CEA").

3.      On April 1, 2015, the Commodity Futures Trading Commission ("CFTC") brought a civil action entitled *U.S. Commodity Futures Trading Commission v. Kraft Foods Group, Inc. and Mondelēz Global LLC*, 1:15-cv-02881 (N.D. Ill.), against Defendants for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2012) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2014) for using a deceptive or manipulative device in connection with the December 2011 wheat futures contract and cash wheat traded on the Chicago Board of Trade; for holding wheat futures positions in excess of CFTC speculative position limits set forth in Regulation 150.2, 17 C.F.R. § 150.2 and CBOT speculative position limits; and by engaging in wash sales by trading both sides of an exchange-for-physical ("EFP") CBOT wheat contract at least five times per year between at least 2009 and continuing through January 2014.

4.      Kraft is one of the largest end users of wheat in the country.  In order to satisfy demand for its snack foods, Kraft consumes roughly 30 million bushels of #2 Soft Red Winter Wheat each year, which it transforms into flower at its Toledo, Ohio, mill.

5.      #2 Soft Red Winter Wheat is the same variety of wheat deliverable against the CBOT wheat futures contract.

6.      Given the large amount of #2 Soft Red Winter Wheat that it consumes on a daily basis Kraft has a large exposure to changes in wheat prices.  Rather than managing this exposure through ordinary (and legal) means, beginning in or about 2003 and continuing through January 2014, Defendants executed a scheme to manipulate the prices of cash wheat and wheat futures contracts traded on the CBOT for their financial benefit to the detriment of Plaintiff and members of the Class, who transacted in #2 Soft Red Winter Wheat derivatives on the CBOT.

7.     Prior to each of the five annual delivery periods for CBOT wheat, Defendants conducted off-exchange futures transactions between the two separate Kraft corporate trading accounts that carried Kraft's long and short positions, improperly offsetting Kraft's short positions with its long positions.

8.     Defendants hatched and successfully executed a scheme to manipulate the prices of CBOT wheat futures contracts, which revolved around the abrupt purchase and sale of $90 million of CBOT wheat futures—a six month supply of wheat.  Defendants had no economic reason to conduct these trades and never intended to take delivery of this wheat.  Instead, Defendants executed this strategy with the intention that the market would react to their enormous long position by lowering cash wheat prices and increase the spread between December 2011 and March 2012 CBOT wheat futures contracts.

9.     In aid of its scheme Defendants far exceeded legal limits for speculative positions, designed to protect investors from such manipulation, by more than 300%.

10.     By executing this manipulative strategy, Defendants lowered their physical wheat costs and generated a profit in its financial wheat positions.  However, while these illicit profits benefited Defendants' bottom line, they caused harm to Class members who transacted in CBOT wheat futures contracts at artificial prices proximately caused by Defendants' manipulative conduct.

## II.     PARTIES

### A.     PLAINTIFF

11.     Plaintiff HENRIK CHRISTENSEN is a natural person and resident of the United Kingdom.

12.     Plaintiff transacted in multiple CBOT #2 Soft Red Winter Wheat derivatives during the Class Period.

13.     Defendants' manipulative conduct directly, proximately, and materially caused injury to Plaintiff in its business or property.

**B.     DEFENDANTS**

**1.     Kraft Foods Group, Inc.**

14.     Defendant Kraft Foods Group, Inc. ("Kraft") is a Virginia corporation, with its corporate headquarters located at Three Lakes Drive, Northfield, Illinois 60093-2753.

15.     Kraft is one of the largest consumer packaged food and beverage companies in North America and worldwide, with net revenues of $18.2 billion in 2014. Kraft manufactures and markets food and beverage products including cheese, meats, coffee, packaged dinners, snack nuts, dressings and other grocery products primarily in the U.S. and Canada.

16.     In March 2012, Kraft re-domesticated from its original incorporation in Delaware in 1980 to Virginia and changed its name from Kraft Foods Global, Inc. to Kraft Foods Group, Inc. On October 1, 2012, Mondelēz International, Inc. (formerly known as Kraft Foods Inc.) spun off its North American grocery business and distributed 100% of the common stock of Kraft Foods Group, Inc. owned by Mondelēz International to its shareholders. Prior to the spin-off, Kraft Foods Group, Inc. was a wholly-owned subsidiary of Mondelēz International, Inc.

17.     As a result of the Mondelēz International, Inc. spin-off to its shareholders, Kraft Foods Group, Inc. became an independent, publicly traded company on NASDAQ on October 1, 2012.

18.     The operative spin-off agreements apportion liability between Kraft Foods Group, Inc. and Mondelēz International, Inc.

### 2.      Mondelēz Global LLC

19.      Defendant Mondelēz Global LLC ("Mondelēz") is a Delaware limited liability company with its principal place of business located at Three Parkway North Boulevard, Deerfield, IL 60015 and a wholly-owned subsidiary of Mondelēz International, Inc.

20.      Mondelēz operates the North American snack food business of Mondelēz International, Inc., with revenues of $6.9 billion in 2014.  Following the spin-off of the North American grocery business described above, Mondelēz International, Inc. retained the global snacks business along with other food and beverages categories.

21.      Mondelēz International, Inc. ("Mondelēz International") is a Virginia corporation with its principal place of business also located at Three Parkway North, Deerfield, Illinois 60015.

22.      Mondelēz International is one of the world's largest snack companies with global net revenues of $34.2 billion in 2014.  It manufactures and markets snack food and beverage products for consumers in 165 countries, including the brands Nabisco, Oreo, Cadbury, Trident gum, Jacobs coffee and Tang powdered beverages.  Mondelēz International shares are traded on NASDAQ.

## III.   AGENTS

23.      Other entities and individuals unknown to Plaintiff at this time participated in the acts alleged herein and performed acts in furtherance of the manipulation scheme.

24.      Whenever reference is made to any act, deed, or transaction of any company, corporation or partnership, the allegation means that the company, corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, partners, representatives, parent, predecessors or successors-in-interest while they were actually

engaged in the management, direction, control or transaction of business or affairs of the company, corporation or partnership.

## IV.    JURISDICTION AND VENUE

25.    This action arises under Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25.

26.    Wheat is a commodity in interstate commerce and is the commodity underlying wheat futures and options contracts traded on the CBOT, as those terms are defined and used in Sections 1(a)4 and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D) respectively.

27.    The CBOT is one of four Designated Contract Markets comprising the CME Group Inc.  As a Designated Contract Market, the CBOT is regulated by the Commodity Futures Trading Commission ("CFTC").  The CME Group Inc.'s Global headquarters are located at 20 South Wacker Drive, Chicago, IL 60606.

28.    This Court has subject matter jurisdiction under Section 22 of the CEA, 7 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

29.    Venue is proper in this District under 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

30.    Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC also have their headquarters located in this District.

31.    Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.  During the Class

Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

32.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their agents committed overt acts in furtherance of their illegal manipulation, in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## V.     CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on behalf of itself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") defined as follows:

> All persons and entities that purchased and/or sold CBOT wheat futures and options contracts during the period of at least January 1, 2003 through January 2014.

34.     Excluded from the Class are Defendants and their employees, subsidiaries, affiliates, parents, partners, and agents, whether or not named in this Complaint.

35.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

36.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

37.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

38.     Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation.

39.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants manipulated the prices of wheat futures contracts traded on the CBOT;

b.      Whether Defendants' conduct violated the CEA;

c.      Whether Defendants' violations caused injury and damage to Plaintiff and the members of the Class;

d.      The appropriate measure of damages resulting from the violation of the CEA;

e.      The operative time period of Defendants' violations of the CEA;

f.      Whether Defendants were unjustly enriched at the expense of Class members; and

g.      Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

40.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not

practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

41.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.     FACTUAL ALLEGATIONS

### A.     Kraft's Purchases of Wheat in Cash Market and Wheat Futures Contracts Sold on the CBOT Prior to the Manipulation Scheme

42.     Defendants are two of the largest domestic end users of #2 Soft Red Winter Wheat, which is the variety of wheat deliverable against the CBOT wheat futures contract. Kraft consumes approximately 30 million bushels of wheat per year (or roughly 2.5 million bushels per month) for use in production of products like Oreo, Chips Ahoy!, Ritz, Triscuit and Wheat Thins. Ninety percent of the wheat used by Kraft is milled into flour at Kraft's Toledo, Ohio Flour Mill (the "Mill") on the Maumee River, which flows into Maumee Bay, Lake Erie.

43.     In order to produce usable flour, Kraft requires wheat for milling that meets certain specifications for baking and human consumption. These specifications include the permissible number of insect damaged kernels and maximum allowable levels of vomitoxin (a mycotoxin that may be produced in wheat infected by Fusarium head blight or scab).

44.     According to the U.S. Food and Drug Administration guidance, finished baked goods must have a vomitoxin level below one part per million. Normal wheat milling processes and cleaning technologies can substantially reduce vomitoxin levels in finished flour by approximately one-half from the level in unprocessed wheat. Vomitoxin levels in finished flour also can be reduced in the milling process by blending in wheat possessing lower vomitoxin levels.

45.     Kraft will also consider certain baking characteristics of wheat, including gluten content and solvent retention levels, to ensure that it is able to produce flour that will meet its commercial baking needs.

46.     Kraft typically purchases wheat on a daily basis throughout the year, seeking to ensure that it always has sufficient supply for the Mill.  Kraft has the capacity to store 5 million bushels of unprocessed wheat at the Mill, and it strives to maintain two months' supply in its inventory.

47.     Kraft has two primary options for obtaining the wheat it requires.  First it can purchase wheat directly from a grain producer or wholesaler in the cash market.  When Kraft sources through the cash market, it can negotiate the wheat specifications in the contracts to ensure that the quality of wheat meets its requirements.  For example, in its contracts, Kraft regularly specifies a maximum vomitoxin level of two parts per million and maximum insect damaged kernels of three per 100 grams.

48.     When Kraft purchases wheat in the cash market, it can also negotiate the delivery location and process.  Because of the location of the Mill, when it purchases in the cash market, Kraft will ordinarily source wheat from the Toledo region, which includes Ohio, Indiana, Michigan and Ontario, and have it delivered to the Mill by rail or truck.

49.     Warehouses and shipping stations outside the Toledo region, including those down the Mississippi River, are not required to transport wheat to Toledo by rail or truck. Consequently, it is not advantageous for Kraft to take delivery of wheat down the Mississippi River, as Kraft would have to arrange for the wheat to be barged to a location where it could be transferred to rail, and then shipped to the Mill, significantly increasing the cost to Kraft.  It is not possible to barge wheat directly from locations down the Mississippi River to the Mill.

B.       **CBOT Wheat Futures Trading**

50.      Kraft's second primary option for sourcing wheat is to purchase wheat futures contracts sold on the CBOT.  The CBOT is a registered entity as defined in Section 1a(40) of the Commodity Exchange Act and is one of four Designated Contract Markets for trading futures contracts pursuant to Section 5 of the CEA that make up the CME Group, Inc. ("CME").  The CBOT maintains rules applicable to futures trading of wheat and the CME conducts surveillance and compliance activities related to CBOT trading.

51.      A futures contract is a standardized agreement between two parties to purchase or sell a predetermined quantity of a commodity during a future month, at a price that is determined at the initiation of the contract.  The trader who purchases the commodity is said to have a "long position," while the trader who sells the commodity is said to have a "short position."  Futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract or "offset" by entering an equal and opposite trade, effectively eliminating the original position.

52.      Chapter 14 of the CBOT Rules governs the specifications for and trading of wheat futures.  A wheat futures contract consists of 5,000 bushels of wheat, subject to further quality specifications (CBOT Rules 14102.B, 14104).

53.      The minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads (CBOT Rule 14102.C).

54.      CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March, May, July, September, and December (CBOT Rule 14102).

55.      Delivery on the CBOT wheat contract is effected when the seller of the futures contract tenders a "shipping certificate" (which represents an interest in wheat for load-out from a CBOT-approved delivery facility) to the buyer of the futures contract (*see generally* CBOT

Rules 14105-14110). Shipping certificates may also be bought and sold between traders or exchanged for futures positions.

56.     Wheat acquired via the futures market is typically of a lower quality than that sourced in the cash market. For example, during the Class Period, CBOT rules specified that deliverable wheat could have vomitoxin levels of up to four parts per million (CBOT Rule 14104). The deliverable wheat actually available rarely had levels below two parts per million.

57.     Further, parties who take delivery of CBOT wheat do not have the ability to specify delivery location or load out process, nor do they even know the delivery location for the contracts they have purchased until they receive shipping certificates.

58.     Because of the inability to control wheat quality or delivery location, Kraft rarely takes delivery of wheat via the CBOT delivery process. Indeed, Kraft typically specifies in its cash market contracts that it will not accept wheat registered for delivery under CBOT contracts because such wheat is typically blended down by mixing lower quality product so that the overall mixture will barely meet the minimum CBOT requirements.

59.     Prior to Fall 2011, Kraft last took delivery of wheat via the CBOT delivery process in 2002.

60.     Instead of taking delivery of CBOT wheat, Kraft normally uses the futures markets to hedge its cash wheat purchases, taking long futures positions that roughly correlate with its actual wheat needs and then offsetting these positions as it acquires physical wheat in the cash market.

## C.     Kraft Engaged in Fictitious EFP Transactions

61.     Kraft maintains several trading accounts in which it conducts wheat futures transactions for both long and short hedging positions. Kraft's internal computer software

cannot distinguish between long and short positions for the same contract month within the same account, so Kraft's practice has been to place its long wheat futures positions in one account and its short wheat futures positions in a second account to keep track of them.

62.     Beginning in or about 2003 and continuing through January 2014, prior to each of the five annual delivery periods for CBOT wheat, Kraft conducted an off-exchange transaction between two Kraft accounts carrying the long and short positions whereby Kraft's short position was offset by its long position.  Kraft's finance department determined the price level at which each transaction would be done and communicated that information to wheat procurement staff who directed Kraft's clearing firm to execute the transaction.  Each of the transactions was cleared through the CME as an EFP.

63.     Pursuant to Regulation 1.38(a), 17 C.F.R. § 1.38(a), noncompetitive, off-exchange futures trades are permitted only when they are executed in accordance with the rules of the relevant exchange.

64.     CME Rule 538 and CBOT Rule 538 permit "Exchanges for Related Positions" – of which EFPs are a subset – under certain conditions.  EFPs are permissible only if they are between two independent parties and involve a privately negotiated and simultaneous exchange of a futures position for a corresponding and offsetting cash physical position.  EFPs must be cleared and reported to the appropriate exchange and the parties must prepare proper documentation for both parts of the transaction, including the same documentation that would accompany any other sale of a physical commodity.

65.     Kraft controlled both trading accounts involved in these EFP transactions.  Kraft also did not actually transfer physical wheat in connection with any of the EFP transactions, nor did it create any of the documentation that ordinarily accompanies the sale of a physical

commodity. The only documentation for these EFP transactions are the notations of the transfer of the futures position between accounts in Kraft's futures account statements and internal records. Because they did not involve the actual transfer of physical wheat between two independent parties, Kraft's EFPs were impermissible and violated Regulation 1.38.

**D.** **Kraft Manipulated or Attempted to Manipulate the Wheat Markets During 2011**

66. In the late Summer 2011, cash wheat prices for #2 Soft Red Winter Wheat at Toledo, Ohio had risen from a price of $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011. Over the same time, the price of December 2011 CBOT wheat futures increased from $6.575 to $7.97.

67. Even though cash wheat prices were rising, there was sufficient wheat available in the cash wheat market for Kraft to purchase and deliver to the Mill to satisfy Kraft's needs.

68. In response to these elevated cash prices, however, Kraft deviated from its practice of using the futures markets solely to hedge its cash wheat purchases. Kraft wheat procurement staff developed, and Kraft senior management approved, a strategy to use its status as a commercial hedger to acquire a huge long position in December 2011 CBOT wheat futures in order to induce sellers to believe that Kraft would take delivery, load out, and use that wheat it its Mill.

69. In developing the strategy, Kraft, acting through certain of its procurement staff and certain senior management, intended that the futures market would react to its enormous long position by increasing the price of the December 2011 CBOT wheat futures contract while reducing the differential between the December futures price and the price of the cash market wheat.

70.     Kraft executed its plan, and the market reacted as Kraft expected, yielding Kraft more than $5.4 million in futures trading profits and savings from its strategy.

71.     In fact, Kraft, acting through its procurement staff, acquired its December 2011 long position without any intention of loading out, delivering and using the majority of the CBOT wheat it stood to acquire.

72.     Kraft, acting through its procurement staff, executed a "trial run" of this strategy in September 2011, taking delivery of 250,000 bushels of CBOT wheat, which constituted 50 total certificates.  Upon standing for delivery, 31 of the 50 certificates that Kraft received in September 2011 were for wheat located at locations on the Mississippi River that were more than 650 miles from the Mill and would have required at least two changes in mode of transport and shipment in the opposite direction of the commercial flow of wheat to bring the wheat to the Mill.  This meant that Kraft could not use barges to transport the wheat directly to the Mill, and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail transport.  As a result of this test involving just 50 certificates, Kraft knew that it could not rely upon taking delivery of CBOT wheat to source wheat easily transportable to the Mill.

73.     At around the same time, Kraft submitted a public comment to the CFTC in response to a proposed change to CBOT rules removing language requiring wheat delivery facilities to be connected to railroad service.  Kraft's comment requested that the language not be removed.  Kraft's position was not adopted.

74.     Nevertheless, in October 2011, Kraft's wheat procurement staff proposed to Kraft senior management that Kraft adopt a strategy of buying $90 million of December 2011 CBOT wheat futures in early December 2011 in order to depress the price of wheat in the cash market and inflate the futures price of wheat.

75.     In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior

management, the Kraft Senior Director of Global Procurement, explained the strategy as follows:

> Given our proposal to "take physical deliver in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, there is a key market dynamic that is important to understand: **Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft.  We will then have the option of redelivering the wheat acquired through the futures market.  This will then quickly reverse the negative cash flow impact.**

(emphasis added)

76.     When considering the Kraft procurement staff's $90 million December 2011

wheat futures proposal, Kraft senior management required that the futures position could not

exceed $50 million by the end of December.  Kraft procurement staff agreed to sell at least $40

million of the proposed $90 million position by the end of the month.  Kraft senior management

then approved the procurement staff proposal for Kraft to buy $90 million of December 2011

wheat futures, knowing that the procurement staff would sell $40 million of the position before

the end of the month.

77.     Kraft did not have a *bona fide* commercial need for $90 million of wheat – which

would amount to approximately 15 million bushels, or a six-month supply for the Mill – in

December 2011.

78.     Kraft had never possessed that quantity of wheat, and had no ability to store that

quantity of wheat within its own facilities.  Indeed, Kraft did not even have a *bona fide*

commercial need for or present ability to store $50 million of wheat (its proposed $90 million

position net of selling $40 million) – which would amount to more than an additional three months' supply for the Mill.

79.     As of November 2011, Kraft already possessed more than 4.2 million bushels of wheat in storage at the Mill, which represented more than 80% of its storage capacity. If Kraft were to have taken delivery of 15 million bushels of wheat – an amount equivalent to approximately 3,000 certificates – in December 2011, it would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the wheat for up to six months.

80.     In addition, in order to use CBOT wheat, Kraft would have had to buy and store yet additional higher-quality cash wheat to blend with the lower-quality CBOT wheat so as to ensure the wheat would meet its baking specifications. Thus, Kraft would have needed to locate and pay for storage costs far in excess of 15 million bushels.

81.     Kraft never intended to take delivery of 15 million bushels of wheat, but instead desired only to make the market *believe* that it would take delivery, load out and store that wheat for use in the Mill. Kraft intended for the market to react to its long position by lowering the price of cash wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash market at more favorable prices. Kraft also intended to profit from the positions it held in December 2011 and March 2012 CBOT wheat futures by narrowing the spread between the two contracts.

82.     Kraft procurement employees, including the Senior Director of Global Procurement and the Associate Director of Procurement, executed the strategy, ultimately accumulating 3,150 long December 2011 CBOT wheat futures contracts by November 29, 2011, the first day of the delivery period, equivalent to 15.75 million bushels or approximately $93.5

million of wheat. As of December 7, 2011, Kraft's spot month wheat position constituted 87%

of the December 2011 CBOT wheat futures open interest.

83. In a second email on December 2, 2011 to Kraft senior management, the Kraft

Senior Director of Global Procurement confirmed that the strategy was working as planned:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread
> at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME
> wheat, representing a $7MM+ saving over commercially sourced wheat. Since
> Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. **As
> expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents
> resulting in a marked to market gain of $3.6MM on our open spread
> position. Meanwhile, with the narrowing spread, the cash wheat basis has
> declined from +80 cents to +50 cents over Dec futures.** As we begin
> purchasing this cheaper basis commercial wheat, we will unwind the existing
> spread position. **If all goes according to plan, we will still save $7MM on the
> commercial cost of wheat** vs where it was a few weeks ago **as well as make $2-
> 3MM on reversing out of the Dec/Mar wheat spread**.

(emphasis added).

84. Upon standing for delivery of December 2011 CBOT wheat contracts, the

shipping certificates that Kraft received were all for wheat located in warehouses on the

Mississippi River, which are outside the Toledo region and which warehouses are not required to

transport wheat to Toledo by rail. To take delivery, Kraft had to arrange for the wheat to be

barged to a location where it could be transferred to rail, and then shipped to the Mill. These

shipping arrangements significantly increased Kraft's costs by approximately $1.21 per bushel.

85. Ultimately, Kraft took delivery of 1,320 shipping certificates for December 2011

CBOT wheat, or a total of 6.6 million bushels. It loaded out just 660,000 bushels (132 contracts)

of that wheat, which was less than 5% of the wheat position it carried in early December and

equivalent to approximately $4 million worth of wheat.

86. After prices in the cash market declined, Kraft resold 1,188 of its December 2011

shipping certificates for $35,725,074.

87.     On December 9, Kraft offset all of its 826 remaining long futures contracts in the market (80% of the open interest), which amounted to 78.3% of the trading volume that day.

88.     Kraft did not purchase a similar quantity of wheat in the cash market, which would be expected if it had really needed that wheat for its commercial operations.

89.     Kraft's actions proximately caused cash wheat prices in Toledo to decline and the December 2011/March 2012 wheat futures spread to narrow, which was favorable to Kraft.  In particular, December 11 wheat contract futures prices increased from $5.75 as of November 28, 2011 to $6.12 as of December 2, 2011.  Cash wheat prices in Toledo declined from $6.16 per bushel as of December 2, 2011 to $5.86 per bushel as of December 9, 2011.  As a result of these price shifts, Kraft earned over $5.4 million in profits.

### E.     Kraft Violated Speculative Position Limits

90.     During the relevant time, CFTC regulations specified the position limit levels for wheat futures.  70 Fed. Reg. 24705, 24707, *Revision of Federal Speculative Position Limits* (CFTC May 11, 2005).  It published those levels in CFTC Regulation 150.2, 17 C.F.R. § 150.2 (2011), which provided that no person may hold or control a net long or net short position for the purchase or sale of wheat for future delivery traded on the CBOT in excess of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined.  These position limits are intended to protect the futures market from excess speculation that could cause unreasonable or unwarranted price fluctuations.

91.     Consistent with the CFTC, the CBOT adopted speculative position limits for CBOT wheat futures at the CFTC-specified levels.  The CBOT position limit scheme for wheat futures included a prohibition against trading in excess of position limits, as set forth in CBOT Rule 14102.E. ("Position Limits, Exemptions, Position Accountability and Reportable Levels"),

which referenced harmonized CME/CBOT Rule 559 ("Position Limits and Exemptions"), which, in turn, provided that the position limit levels applicable to those contracts with position limits are set forth in the "Position Limit, Position Accountability and Reportable Level Table" ("Table") in the Interpretations Section at the end of Chapter 5 of the exchange rules. During the relevant time, the Table identified a wheat futures spot month level of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined.

92.     Traders who are *bona fide* hedgers – such as producers or end-users of particular commodities, like Kraft – can apply for exemptions to speculative position limits based on a demonstration of *bona fide* hedging needs. Requests for hedge exemptions from exchange limits must be submitted to the CME, which reviews the requests and, if approved, issues a letter setting out the specific additional limit it has approved for the entity. Hedge exemptions are valid for one calendar year and are renewable only through the submission of another application to the CME.

93.     At all times relevant to this Complaint, the CBOT speculative position limit for wheat futures contracts was 600 contracts during the spot month. Spot month is defined as commencing at the close of business on the business day prior to the first notice day – the day after which the purchaser of a futures contract may be required to take physical delivery – for any delivery month and terminating at the end of the delivery period. Regulation 151.3, 17 C.F.R. § 153.3 (2011). For the December 2011 CBOT wheat contract, the spot month period began on November 29, 2011.

94.     As a commercial end user flour made from wheat, Kraft is eligible to seek a hedge exemption to cover its wheat needs. In or about October 2010, Kraft submitted such an

application to the CME. On October 22, 2010, Kraft received an exemption approval letter, permitting it to maintain wheat positions in excess of the speculative position limit, effective December 1, 2010. The exemption approval letter noted that "positions in the last five days of trading of any futures contract may not exceed Kraft's unfilled anticipated requirements of the same cash commodity for that month and the next succeeding month."

95.     The exemption approval specifically noted that exemptions must be renewed on an annual basis and that any application by Kraft to renew its exemption must be submitted to the CME by no later than December 1, 2011.

96.     Kraft did not submit a request for renewal of its hedge exemption until December 28, 2011. Consequently, beginning on December 2, Kraft no longer had a CME hedge exemption for the December 2011 wheat contract and it was bound by the 600 contract speculative position limit in that commodity. Kraft also did not request a hedge exemption with the CFTC for December 2011.

97.     Kraft did not have a *bona fide* commercial need for the long futures position that it acquired in December 2011 wheat.

98.     Kraft held long positions in December 2011 wheat that exceeded the mandated speculative position limit for wheat on December 2 by 2,110 contracts; on December 5 by 2,106 contracts; on December 6 by 1,666 contracts; on December 7 by 1,226 contracts; and on December 8 by 226 contracts.

99.     Kraft also accepted delivery of 1,320 December 2011 CBOT wheat futures contracts between November 30, 2011 and December 7, 2011.

## VII.    CFTC INVESTIGATION OF KRAFT

100.    On April 1, 2015, the Commodity Futures Trading Commission ("CFTC") brought a civil action entitled *U.S. Commodity Futures Trading Commission v. Kraft Foods Group, Inc. and Mondelēz Global LLC*, 1:15-cv-02881 (N.D. Ill.), against Defendants Kraft Foods Group, Inc. and Mondelēz Global LLC for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2012) and CFTC Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2014) for using a deceptive or manipulative device in connection with the December 2011 wheat futures contract and cash wheat traded on the Chicago Board of Trade; for holding wheat futures positions in excess of CFTC speculative position limits set forth in Regulation 150.2, 17 C.F.R. § 150.2 and CBOT speculative position limits; and by engaging in wash sales by trading both sides of an exchange-for-physical ("EFP") CBOT wheat contract at least five times per year between at least 2009 and continuing through January 2014.

## VIII.   FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

101.    By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

102.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until it became public on April 1, 2015.

103.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class counsel could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on April 1, 2015.

104.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## COUNT I:
## PRICE MANIPULATION
## VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1 *ET SEQ.* AND
## CFTC RULE 180.2

105.     Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

106.     Defendants Kraft and Mondelēz were each an agent and/or other person acting on behalf of the other Defendant.

107.     Defendants, through their acts alleged herein, specifically intended to, and did, cause unlawful and artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and options in violation of Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*. and Regulation 180.2, 17 C.F.R. §180.2.

108.     Defendants acted for one another and in all circumstances alleged herein, Defendants had the ability to cause, and did cause, artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and options.

109.     By the conduct alleged herein, Defendants manipulated the price of a commodity in interstate commerce or for future delivery subject to the rules of a registered entity, in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*

110.     Because the actions of Defendants' wheat procurement employees and senior management alleged herein occurred within the scope of their employment, office or agency with Defendants, Defendants are liable as principals for the violations of Commodity Exchange Act, 7 U.S.C. § 2(a)(1(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

111.    Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in a market that was artificial and manipulated, and at manipulated prices, during the Class Period.

112.    Plaintiff and Class members are entitled to damages for the violations of Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 180.2, 17 C.F.R. §180.2 alleged herein.

**COUNT II:**
**PRICE MANIPULATION**
**VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1 *ET SEQ.* AND CFTC RULE 180.1(A))**

113.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

114.    Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT #2 Soft Red Winter Wheat futures contracts and options and engaged in overt acts in furtherance of its intent in violation of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*

115.    By the conduct alleged herein, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in acts, practices and a course of business which operated as a fraud or deceit upon a person in violation of Commodity Exchange Act, 7 U.S.C. §9 and 7 U.S.C. § 25 and Regulation 17 C.F.R. § 180.1.

116.    Because the actions of Defendants' wheat procurement employees and senior management alleged herein occurred within the scope of their employment, office or agency with Defendants, Defendants are liable as principals for the violations of Commodity Exchange Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2 (2014).

117.    Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in a market that was artificial and manipulated, and at manipulated prices, during the Class Period.

118.    As a direct result of the conduct alleged herein, Plaintiff and members of the Class transacted at artificial and unlawful prices, and transacted in an artificial and manipulated market, during the Class Period.  Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

119.    Plaintiff and Class members are entitled to damages for the violations of Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a), 17 C.F.R. §180.1(a) alleged herein.

## COUNT III:
## PRINCIPAL-AGENT LIABILITY
## VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 2(A)(1)(B) AND REGULATION 1.2

120.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

121.    Each Defendant is liable under Section 2(a)(1)(B) of the Commodity Exchange Act, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2014) for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

122.    Plaintiff and members of the Class are each entitled to actual damages sustained for violations of the CEA.

## COUNT IV:
## AIDING AND ABETTING
## VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 1, *ET SEQ.*

123.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

124.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by the other Defendant as alleged herein.  Each Defendant did so knowing of other Defendant's manipulation of CBOT #2 Soft Red Winter Wheat futures contracts and options and substantially and willfully intended to assist those manipulations to cause the prices of CBOT #2 Soft Red Winter Wheat futures contracts and options to be artificial during the Class Period, in violation of § 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l).

125.    Under § 13 of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

126.    Other persons willfully intended to assist these manipulations to cause the price of CBOT #2 Soft Red Winter Wheat futures contracts and options to reach artificial levels during the Class Period, in violation of Section 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l).

127.    Plaintiff and members of the Class are each entitled to actual damages sustained for the violations of the CEA.

## COUNT V:
## UNJUST ENRICHMENT

128.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

129.    The Defendants each benefitted financially from their unlawful acts described herein, including, but not limited to, manipulating the prices of CBOT #2 Soft Red Winter Wheat futures contracts and options.  These unlawful acts caused Plaintiff and the Class to suffer injury,

financial loss, and otherwise be deprived of the benefit of un-manipulated CBOT #2 Soft Red Winter Wheat futures contracts and options, and received less in value than they would have received in the absence of Defendants' wrongful conduct.

130.    Due to the acts of Defendants as alleged in this Complaint, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

131.    Plaintiff and the Class seek restitution of the monies and financial benefits of which they were unjustly deprived, as described herein, and have no adequate remedy at law.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays the Court for a judgment, as follows:

A.    Plaintiff prays that the Court adjudge and decree that Defendants violated the Commodities Exchange Act, 7 U.S.C. § 1, et seq. and enter joint and several judgments against Defendants in favor of Plaintiff and members of the Class.

B.    Plaintiff prays that the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class.

C.    Plaintiff prays that the Court award damages against Defendants for their violations of Commodities Exchange Act, 7 U.S.C. § 1, et seq.

D.    Plaintiff prays that the Court cause Defendants to disgorge their ill-gotten gains to Plaintiff and members of the Class.

E.    Plaintiff prays that the Court award reasonable costs of suit.

F.    Plaintiff prays that the Court award pre- and post-judgment interest.

G.      Plaintiff prays that the Court award reasonable attorneys' and experts' fees and expenses.

H.      Plaintiff prays that the Court grants such injunctive, declaratory relief and such other, further and different relief as is just and proper.

## X.      DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and members of the proposed Class, respectfully demands a trial by jury on all issues so triable.

Dated: April 16, 2015

Respectfully submitted,

/s/ David Lesht
David Lesht
Law Offices of Eugene M. Cummings, P.C.
55 W. Monroe, Suite 3500
Chicago, Illinois 60603
Tel: (312) 984-0144
Tel: (312) 948-4403 (direct with voicemail)
Fax: (312) 984-0146
Email: dlesht@emcpc.com

***Counsel for Plaintiff and the Proposed Class***